UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BOB DAWSON, *et al.*,

               Plaintiffs,

     v.

PORCH.COM, *et al.*,

               Defendants.

CASE NO. 2:20-cv-00604-RSL

ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

     This matter comes before the Court on "Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint." Dkt. # 130. Having reviewed the memoranda, declarations, and exhibits submitted by the parties and the remainder of the record,[1] the Court finds as follows:

## BACKGROUND

     Plaintiffs are 993 individuals from around the country who allege that they received unsolicited and unwanted text messages from GoSmith, Inc., in a campaign developed and directed by defendants Darwin Widjaja, Brenton Marrelli, and Matthew Ehrlichman. The text messages offered to connect the recipients with homeowners who needed projects or

---

[1] This matter can be resolved on the papers submitted. The request for oral argument is DENIED.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 1

work done in exchange for payment of a fee. Plaintiffs allege that they never gave their phone numbers to defendants and never consented to receiving text messages from them.

Plaintiffs allege that defendants used autodialing technology to send text messages to all of the 993 plaintiffs in this case, some of whom received over 1,000 messages from GoSmith. In addition, plaintiffs allege that:

▪ 319 of them registered their phone numbers on the national Do Not Call Registry ("DNCR") and yet continued to get text messages from GoSmith;[2]

▪ 947 of them received telemarketing text messages from GoSmith that did not meet the minimum standards of 47 C.F.R. § 64.1200(d); and

▪ 185 of the plaintiffs, all of whom are residents of Washington, received commercial electronic text messages in violation of RCW 19.190.060.

Defendant Marrelli is the co-founder and the Chief Executive Officer ("CEO") of GoSmith. Defendant Widjaja is the other co-founder of GoSmith and served as its Chief Technology Officer ("CTO"). Porch.com acquired GoSmith in January 2017, at which point Widjaja also became a Vice President of the new parent company. Defendant Matthew Ehrlichman is listed in Washington's corporate records as a Governor of GoSmith and in California's corporate records as GoSmith's CEO. Plaintiffs also allege that Ehrlichman is an officer and/or director of Porch.com. On or about January 31, 2020, GoSmith shut down its operations, recommended that those who were interested in

---

[2] At one point in the Second Amended Complaint, plaintiffs allege that 326 plaintiffs registered with the DNCR. Dkt. # 108 at ¶ 35. The difference is immaterial for purposes of this motion.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 2

purchasing customer leads sign up with defendant Porch.com, and migrated the ProviderID files to Porch.com (unless the provider affirmatively requested that it not do so).

The Second Amended Complaint contains a statement of facts related to each of the 993 plaintiffs. By way of example, the statement regarding Washington resident Alex Boychenko states:

> Alex Boychenko personally owns and uses the cellular phone number xxx-xxx-0367. This number is a residential telephone subscription. In the four years preceding 4/22/2020 (the date Boychenko's original Complaint was filed), GoSmith sent Boychenko at least 489 telemarketing text messages at this number. GoSmith knowingly and willfully sent these text messages using an automatic telephone dialing system in violation of 47 U.S.C. § 227(b)(1)(A)(iii). GoSmith knowingly and willfully sent these text messages without instituting procedures that meet the minimum standards required for telemarketing in violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d). Boychenko seeks an amount not less than $733,500 for at least 489 knowing and willful violations of 47 U.S.C. § 227(b), and an amount not less than $733,500 for at least 489 knowing and willful violations of 47 U.S.C. § 227(c). Alternatively, Boychenko seeks an amount not less than $244,500 for at least 489 negligent violations of 47 U.S.C. § 227(b), and not less than $244,500 for at least 489 negligent violations of 47 U.S.C. § 227(c). Finally, GoSmith sent Boychenko at least 489 commercial text messages in violation of RCW § 19.190.060 for which Boychenko seeks an amount not less than $244,500, attorney's fees, injunctive relief, and treble damages.

Dkt. # 108 at ¶ 205.

Based on the above factual allegations, plaintiffs seek to hold defendants liable for telephone solicitations that violated the national Do Not Call Registry (First Cause of Action), that violated the minimum telemarketing standards of 47 C.F.R. § 64.1200(d) (Second Cause of Action), that were sent using an automated dialing system (Third Cause

of Action), and that were sent to Washington residents without their consent (Fourth Cause of Action). Defendants Ehrlichman, Marrelli, and Widjaja are alleged to be personally liable for GoSmith's actions because they were officers of GoSmith and/or because they personally controlled and directed the illegal activities. Plaintiffs allege that Porch.com is liable for GoSmith's actions because it is GoSmith's alter ego and/or is vicariously liable. Plaintiffs also allege that Ehrlichman, Marrelli, Widjaja, and Porch.com assisted in the transmission of commercial text messages to Washington residents. Plaintiffs seek statutory damages for each illegal text message, totaling almost $400 million, plus costs, pre-judgment interest, and – for the Washington residents – attorney's fees and treble damages.

DISCUSSION

**A. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)**

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). "We are not, however, required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly

subject to judicial notice, or allegations that are merely conclusory, unwarranted

deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

F.3d 992, 998 (9th Cir. 2010).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." []*Twombly*, 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule 8(a)(2), a party must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144–45 (9th Cir. 2021). If the complaint

fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim,

dismissal is appropriate. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035,

1041 (9th Cir. 2010).

### 1. Do Not Call Registry (First Cause of Action)

Plaintiffs allege that GoSmith failed to check the national Do Not Call Registry

("DNCR") and sent more than one text message within a 12-month period to 319 plaintiffs

who had registered their residential phone numbers. Plaintiffs assert that this conduct

violates 47 C.F.R. § 64.12000(c)(2), that defendants Ehrlichman, Marrelli, and Widjaja are

personally liable for those violations as officers of GoSmith and/or because they "directly

controlled, authorized, and participated in the sending of the telephone solicitations," and

that defendant Porch.com is liable under alter ego and vicarious liability theories. Dkt.

# 108 at ¶ 1102.

47 C.F.R. § 64.12000(c)(2) prohibits "any telephone solicitation to . . . [a]

residential telephone subscriber who has registered his or her telephone number on the

national do-not-call registry of persons who do not wish to receive telephone solicitations."

Once a number is registered, the prohibition must be honored indefinitely or until the

consumer cancels the registration or the administrator removes the number from the

registry. A person or entity who makes a prohibited telephone solicitation can avoid

liability if it shows that it has a signed, written consent from the consumer, it has a

personal relationship with the consumer, or (i) it has established and implemented written

procedures to comply with the DNCR rules, (ii) it has trained relevant personnel regarding

the DNCR rules, (iii) it maintains a list of telephone numbers that cannot be contacted, and

(iv) its process for complying with the DNCR rules includes obtaining a version of the

DNCR from the administrator no more than 31 days before a call is made and ensuring that

the registry is not used for any other purpose.

Defendants point out that the DNCR rules do not expressly apply to text messages,

an omission acknowledged by the Federal Communications Commission ("FCC") when it

proposed an amendment to make clear that registration precludes both calls and text

messages to the registered number. Defendants argue that because the amended regulation

went into effect in March 2024, the prohibition against telephone solicitations to registered numbers does not apply to the text messages at issue here, which were sent prior to that date. The argument is not persuasive and flies in the face of binding authority. The FCC makes clear that the amendment serves to "codify the National DNC Registry's *existing protections* to text messages." *In the Matter of Targeting & Eliminating Unlawful Text Messages Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 Advanced Methods to Target & Eliminate Unlawful Robocalls*, FCC 23-107, No. 02-278 at ¶ 26, 2023 WL 8826682, at *7 (Dec. 18, 2023) (emphasis added). No new prohibition was intended. *Id.*, 2023 WL 8826682, at *17, No. 02-278 at ¶ 63 (stating "we are codifying that text messages are included in the National DNC Registry's protections—a position that the Commission and several courts have previously taken— we are not expanding the National DNC Registry's restrictions") (footnote omitted); *Targeting and Eliminating Unlawful Text Messages*, 88 FR 20800-0147, at ¶ 6, 2023 WL 2810653 (Apr. 7, 2023) (stating that the FCC had previously taken the position that text messages are calls for purposes of the Telephone Consumer Protection Act ("TCPA") and now sought "to clarify that the National Do-Not-Call Registry protections apply to text messages as well as voice calls and to codify this clarification in the Commission's rules").

Furthermore, 47 C.F.R. § 64.12000(c)(2) was promulgated by the FCC pursuant to the authority granted in 47 U.S.C. § 227(c)(3). The statute defines "telephone solicitation" to mean "a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.§ 227(a)(4) (emphasis added).

prior to the adoption of the March 2024 rule amendment, the Ninth Circuit recognized that both unsolicited telemarketing phone calls and text messages are prohibited by the TCPA. *See Hall v. Smosh Dot Com, Inc*., 72 F.4th 983, 986 (9th Cir. 2023); *Chennette v. Porch.com, Inc*., 50 F.4th 1217, 1222 (9th Cir. 2022); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017); *Satterfield v. Simon & Schuster, Inc*., 569 F.3d 946, 949 (9th Cir. 2009). Given the relevant case law and the FCC's explanation for the March 2024 amendments, the Court finds that the DNCR rules apply to the text messages at issue in this case.

Defendants also argue that the DNCR claim is inadequately pled because the 319 plaintiffs who have asserted a DNCR claim do not allege the contents of the messages they received, the existence of a "telephone solicitation," the dates on which the messages were received, or "facts sufficient to show that GoSmith sent the messages." Dkt. # 130 at 26. Plaintiffs provide two examples of the type of text messages received, Dkt. # 108 at ¶ 28, as well as the text of the 1,131 messages plaintiff Bob Dawson received, Dkt. # 108-3. Each individual plaintiff provides a range of dates during which he or she received the offending messages. *See, e.g*., Dkt. # 108 at ¶ 102 (alleging that David Abel received at least two calls that violated the DNCR rules between 12/27/2016 and 12/27/2017). Plaintiffs specify how many text messages each of them received from GoSmith and allege that the point and purpose of the messages was to sell them leads for home improvement

work in exchange for payment of a fee. Dkt. # 108 at ¶¶ 26-27 and 101-1093.[3] These

allegations are sufficient to raise a plausible inference that the offending messages

constituted telephone solicitation. With regards to who sent the messages, plaintiffs

specifically allege that the text messages they received were from GoSmith. Dkt. # 108 at

¶ 23. Plaintiffs allege that while the initial text messages failed to disclose the identity of

the sender, Dkt. # 108 at ¶¶ 9 and 40-42, follow-up inquiries and messages revealed the

sender as "Smith," Dkt. # 108 at ¶ 28, or linked to websites such as www.smithjobs-2.com

or www.gosmith.com," Dkt. # 108 at ¶¶ 61-62; Dkt. # 108-3. Plaintiffs further allege that

the first URL redirected to www.gosmith.com, which was owned and controlled by

GoSmith during the relevant period. Dkt. # 108 at ¶¶ 62-63. If GoSmith intends to

challenge the veracity of these allegations, it must do so in the context of a motion for

summary judgment, not in a motion to dismiss.

Finally, defendants assert that the allegations related to nine of the DNCR plaintiffs

are insufficient to raise a plausible inference that he or she is a residential telephone

subscriber because each of the nine plaintiffs admits using their cell phones for both

personal and business reasons and/or admits using both personal and business funds to pay

for the subscription. Dkt. # 130 at 25, n.7; Dkt. # 131-3. Determining whether a mixed-use

phone is "residential" for purposes of the DNCR is a fact-intensive inquiry, but the

presumption is if a cell phone subscriber registers the number, it is "residential." *See*

---

[3] Defendants argue that the text messages did nothing more than offer employment possibilities. According to the allegations of the Second Amended Complaint, however, defendants were offering to sell a service, namely the generation of leads, not to offer employment..

*Chennette*, 50 F.4th at 1225 (listing considerations). Each of the nine plaintiffs identified by defendants have at least one factor that favors a "residential" finding. Taking the allegations in the light most favorable to plaintiffs, they have plausibly alleged residential use.

### 2. Minimum Telemarketing Standards (Second Cause of Action)

The vast majority of the named plaintiffs (947 out of 993) assert a claim under 47 C.F.R. § 64.1200(d), which prohibits "any call for telemarketing purposes to a residential telephone subscriber unless" the caller has instituted a list of minimum procedures designed to ensure that consumers can opt out of receiving such calls. Defendants seek dismissal of this claim on a number of grounds, including inadequacy of the pleading under Rule 12(b)(6) and lack of standing under Rule 12(b)(1). The standing arguments are considered in Section B, below.

#### a. Text Messages As "Calls" for purposes of 47 C.F.R. § 64.1200(d)

Defendants argue that the company-specific do-not-call requirements apply only to telephone calls, not to text messages. As early as 2003, the FCC "allow[ed] wireless subscribers to benefit from the full range of TCPA protections," *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 at ¶ 36 (2003) (hereinafter, "2003 TCPA Order"), and the agency interpreted "call . . . to include both voice calls and text messages" for purposes of 47 U.S.C. § 227(b)(1)(A), *In the Matter of Targeting & Eliminating Unlawful Text Messages Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991 Advanced Methods to Target & Eliminate Unlawful*

*Robocalls*, FCC 23-107, No. 02-278 at ¶ 5, n.8, 2023 WL 8826682, at *2 (Dec. 18, 2023).
The Ninth Circuit has found that the FCC's interpretation is reasonable and consistent with
the dictionary's definition of "call," how text messages are sent and used, and the purposes
of the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).[4]

Although the agency's interpretation of the term "call" was promulgated in the
context of the TCPA's automatic telephone dialing system provision, there is no reason to
believe that the term has a different meaning when used in the do-not-call provisions. The
normal rules of statutory construction give identical words used in different parts of the
same act the same meaning. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995). The 2003
TCPA Order discusses "voice calls," "text calls," and "short message service (SMS) calls,"
indicating that they are all types of calls and, therefore, calls. *See Hudson v. Palm Beach
Tan, Inc.*, No. 1:23CV486(WO)(JEP), 2024 WL 4190513, at *8 (M.D.N.C. Aug. 12,
2024), report and recommendation adopted, No. 1:23-CV-486, 2024 WL 4188310
(M.D.N.C. Sept. 13, 2024) (citing 2003 TCPA Order at 14115-16). In addition, courts
around the country have long allowed claims under 47 C.F.R. § 64.1200(d) to proceed
where text messages, rather than calls, were at issue. *See, e.g.*, *Robison v. 7PN, LLC*, 569
F. Supp. 3d 1175, 1185 (D. Utah 2021); *Barton v. Temescal Wellness, LLC*, 525 F. Supp.
3d 195, 199 (D. Mass. 2021); *Persichetti v. T-Mobile USA, Inc*., 479 F.Supp.3d 1333,
1339-40 (N.D. Ga. 2020); *Drew v. Lexington Consumer Advoc*., No. 16-CV-00200-LB,

---

[4] The Court agrees with this analysis regardless whether deference to the agency's interpretation is appropriate or
not. *See Loper Bright Enterprises v. Raimondo*, __ U.S. __, 144 S. Ct. 2244 (2024).

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 11

2016 WL 9185292, at *7 (N.D. Cal. Aug. 11, 2016). Defendants have not identified any case in which a claim under 47 C.F.R. § 64.1200(d) was dismissed because the telemarketing communication involved a text message rather than a phone call.

### b. Adequacy of Factual Allegations

In order to have a private right of action for violations of the minimum standards set forth in 47 C.F.R. § 64.1200(d), a plaintiff must have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations." 47 U.S.C. § 227(c)(5). Defendants argue that, because no plaintiff has specifically alleged that he or she received more than one call within a 12-month period beginning at least 30 days after requesting to be placed on GoSmith's do-not-call list, the § 64.1200(d) claims fail as a matter of law. This argument presumes that plaintiffs' claim is premised on violations of § 64.1200(d)(3), which requires companies to honor consumer requests not to receive telemarketing calls from the company within 30 days of receiving the request. But each of the 947 plaintiffs asserting a § 64.1200(d) claim alleges that he or she received more than one telemarketing text message within a 12-month period that did not disclose the name of the person or entity sending the message, Dkt. # 108 at ¶¶ 40 and 45, allegations that are sufficient to state a claim under § 64.1200(d)(4). Because plaintiffs have raised a plausible inference of liability under § 64.1200(d), the Second Cause of Action may proceed.

To the extent defendants are specifically seeking dismissal of that portion of the Second Cause of Action based on a violation of § 64.1200(d)(3), the motion has some

merit. Fifty-three plaintiffs appear to be making such a claim, alleging that their requests that GoSmith stop contacting them were ignored. Mark Anderson, for example, alleges that he received at least 200 telemarketing text messages from GoSmith between 2016 and 2020, that he asked GoSmith to stop multiple times, but that GoSmith continued to contact his cell number. Dkt. # 108 at ¶ 125. Humberto Quevedo alleges that he received at least 3,782 messages from GoSmith over a four year period and that he "tried tirelessly to stop the text messages and telephone calls to no avail." Dkt. # 108 at ¶ 833. Billy Smith alleges that he received at least 12 telemarketing messages between 2016 and 2020, that he asked GoSmith to stop multiple times, but that the messages got more frequent. Dkt. # 108 at ¶ 951. These allegations give rise to a plausible inference that Mr. Anderson, Mr. Quevedo, and Mr. Smith received more than one telemarketing call after making a request that GoSmith stop contacting them and, given that these plaintiffs had time to make multiple or tireless efforts to stop the calls, that GoSmith exceeded a reasonable time in which to comply.[5] There are, however, some plaintiffs who fail to allege a do-not-call request, calls made after a do-not-call request, or an extended period in which the calls were received. *See* Dkt. # 108 at ¶¶ 547 (Keith Johnson), 557 (Robert Jones), 857 (Stephen Richardson), 868 (Reese Robinson), 872 (Mark Anthony Rodriguez), 884 (Artem Rudyy), 1048 (Brandon Weichers). In these situations, there is no plausible inference of liability

---

[5] Defendants' reliance on a 30-day "safe harbor" is misplaced. The regulation requires the person making the call to honor a subscriber's do-not-call request "within a reasonable time," which may not exceed 30 days from the request. Thirty days is therefore the outside limit of what is reasonable. Given the automated nature of the calls and allowable responses at issue here, there is no reason to assume that it would take 30 days to honor the subscribers' requests.

under § 64.1200(d)(3) and additional details regarding the stop requests and the next violative call are needed to draw any conclusions or inferences regarding liability under § 64.1200(d)(3).

Defendants also assert that plaintiffs fail to allege that defendants initiated the offending calls without having implemented the required procedures. This is simply incorrect. Each plaintiff alleges that GoSmith intentionally and willfully sent "text messages without instituting procedures that meet the minimum standards required for telemarketing ventures" in violation of § 64.1200(d). Plaintiffs collectively allege facts, including over 120,000 spam messages despite "multiple" and "tireless" efforts to stop the messages and the lack of any identifying information that give rise to a plausible inference that the minimum regulatory requirements were not satisfied. The allegations are sufficient for the Second Cause of Action to proceed except as noted in the preceding paragraph.

### c. Seller Identification Requirements

Defendants challenge the viability of plaintiffs' § 64.1200(d)(3) claims – those related to seller identification requirements – on a number of grounds.

### i. Private Right of Action

Defendants argue that there is no private right of action related to a failure to identify the caller and his, her, or its contact information. Congress instructed the FCC to "prescribe technical and procedural standards" requiring callers to include identifying information in all artificial and prerecorded telephone messages. 47 U.S.C. § 227(d)(3). Subsection (d) of the TCPA does not contain a private-right-of-action provision. Congress

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 14

also instructed the FCC to evaluate methods and procedures that would protect residential

telephone subscribers' privacy rights – including the possibility of establishing a national

do-not-call database – and to promulgate regulations to implement those methods and

procedures. 47 U.S.C. § 227(c)(1)-(3). Congress expressly created a private cause of action

for violations of regulations promulgated under § 227(c). 47 U.S.C. § 447(c)(5).

Defendants argue that the identification of callers regulation found at 47 C.F.R.

§ 64.1200(d)(4) must have been promulgated under § 227(d)(3) of the TCPA, rather than

§ 227(c), based on the similarities between the statutory and regulatory language and two

out-of-circuit cases.

    The Court disagrees. Requiring callers to identify themselves and provide a

telephone number or address at which they can be contacted solves more than one

problem. Section 227(d)(3) of the TCPA is aimed at artificial or prerecorded voice

messages. Because this technology may keep a number "in constant use and not available

to receive calls from the called party," *In the Matter of Rules & Reguls. Implementing the*

*Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8779 at ¶ 53 (1992), a technical fix

requiring the provision of a number other than that of the autodialer or message player was

necessary. This requirement was adopted into the TCPA regulations in 1992 at 47 C.F.R.

§ 64.1200(d). *Id.* In addition, however, the FCC determined that all telemarketing calls

must be accompanied by caller identification information. 47 C.F.R. § 64.1200(d)(4). This

determination was not compelled by 47 U.S.C. § 227(d)(3) and is instead part of the

agency's efforts to protect subscribers' privacy rights by mandating procedures for the

creation and maintenance of company-specific do-not-call lists. Because the authority to adopt such a regulation is found in § 227(c) of the TCPA, the Court finds that the private right of action provided in § 227(c)(5) applies. Although the Ninth Circuit has not yet weighed in on this matter, the vast majority of circuit courts and district courts in this circuit that have considered the issue have reached the same conclusion. *See Shelton v. Fast Advance Funding, LLC*, 805 F. App'x 156, 157 (3rd Cir. 2020); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019); *Charvat v. NMP, LLC*, 656 F.3d 440, 449 (6th Cir. 2011); *Walker-Schaut v. Lido Labs Holding Co.*, No. C23-5944 BHS, 2024 WL 2702007, at *5 (W.D. Wash. May 24, 2024); *Hossfeld v. DIRECTV, LLC*, No. 222CV05339JLSMAA, 2023 WL 3549742, at *4 (C.D. Cal. Mar. 31, 2023). The Court finds that there is a private right of action for violations of the seller identification regulation found in 47 C.F.R. § 64.1200(d)(4).

### ii. Other Limitations

Defendants argue that the seller identification requirements do not apply to the texts at issue in this case because (a) text messages have very limited space and characters, (b) the regulation applies only to artificial or prerecorded voice calls, and (c) a stop request is a precursor to any other violation under § 64.1200(d). The Court rejects these arguments. There is no evidence that text messages are limited in a way that would prevent the seller from meeting the identification requirements. The requirements of § 64.1200(d) apply by their own terms to both "artificial or prerecorded-voice telephone call[s]" and "any call for telemarketing purposes," the latter of which encompasses text messages.

Defendants cite no authority for the proposition that a stop request must be made before a violation of subsection (d) can be found. Nor would such a requirement make sense: forcing sellers to identify themselves ensures that a subscriber has the information needed to make a stop request. Defendants' proposed interpretation of the regulations would allow a seller to insulate itself from receiving stop requests by violating subsection (d)(4) and then argue that every claim under § 64.1200(d) is precluded because there was no stop request. The Court declines to adopt such an unreasonable and counterproductive interpretation of the regulations.

### 3. Automated Dialing System (Third Cause of Action)

Plaintiffs filed this lawsuit seeking statutory damages and injunctive relief for defendants' alleged violations of the autodialing provisions of the TCPA, 47 U.S.C. § 227(a)(1)(A). Plaintiffs allege that defendants, in their attempts to sell customer leads to home improvement contractors, scraped third-party web pages such as Yelp.com, YellowPages.com, BBB.org, *etc.*, to obtain contact and other information regarding the contractors, including their company names, locations, and phone numbers. Defendants then generated a unique, sequential "ProviderID" for each contractor, storing his/her/its information under the ProviderID number and sending automated text messages to the phone numbers stored in each electronic file. Plaintiffs attached to their complaints the information defendants had scraped for Bob Dawson, clearly showing his phone number among the data collected from third-party websites. In these circumstances, plaintiffs' allegations that they did not provide their phone numbers to defendants and had no

account/relationship with them do not give rise to a plausible inference that their phone numbers were generated using a random or sequential number generator. Rather, plaintiffs' allegations of scraping show that the phone numbers were obtained, whole and intact, from third-party sources and make implausible any argument that the numbers were, instead, generated by defendants.

The question, then, is whether intrusive, automated telemarketing practices based on a list of stored phone numbers fall within the TCPA's prohibition against automatic telephone dialing systems. The answer is "no." In April 2021, a year after this lawsuit was filed, the United States Supreme Court held that simply maintaining a database of phone numbers which are then used to automatically send text messages does not constitute use of a prohibited "automatic telephone dialing system" ("ATDS") as that term is defined in the TCPA. *Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021). The Court found that "in all cases, whether storing or producing numbers to be called, the equipment in question must use a random or sequential number generator." *Id.* at 404. Because Facebook merely stored and dialed existing telephone numbers, it was not using an ATDS. *Id.* at 405. The Ninth Circuit was then asked to decide whether the use of a random number generator to organize or determine the order in which existing telephone numbers would be called satisfied the requirements of an ATDS. *Borden v. eFinancial, LLC*, 53 F.4th 1230 (9th Cir. 2022). In *Borden*, the plaintiff specifically alleged that eFinancial used a sequential number generator for two purposes: (1) to generate sequential numbers designated as "LeadID," each of which corresponded to a unique telephone number and (2) to determine

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 18

the order in which the stored telephone numbers would be dialed. *Id.* at 1232. The allegations were deemed insufficient. "We hold that an [ATDS] must generate and dial random or sequential *telephone* numbers under the TCPA's plain text." *Id.* at 1231 (emphasis in original). *See also Brickman v. U.S.*, 56 F.4th 688 (9th Cir. 2022) (rejecting argument that use of a random number generator to determine the order in which numbers were stored and dialed implicates the TCPA).

Plaintiffs have not alleged facts that give rise to a plausible inference that defendants used equipment to randomly or sequentially generate their phone numbers, as required by *Duguid*, *Borden*, and *Brickman*.[6] Instead, they appeal to common sense and Congressional intent to argue that defendants' conduct has the potential for causing the exact kinds of harm that the TCPA was enacted to prevent. Such appeals "cannot overcome the clear commands of §227(a)(1)(A)'s text and statutory context," however. *Duguid*, at 1172. "That Congress was broadly concerned about intrusive telemarketing practices . . . does not mean it adopted a broad autodialer definition." *Id.* Congress was clearly focused on the unique problems posed by the use of random or sequential number generator technology and chose to prohibit the use of those devices. *Id.* That the statute, as

---

[6] Plaintiffs' "reverse append" argument is unavailing. Plaintiffs know exactly how defendants obtained their telephone numbers, having delved into defendants' databases and copied files showing that the data that had been scraped from various identified websites. Plaintiffs made corresponding, specific allegations of fact describing the scraping operation and the information gathered. The "reverse append" argument relies on the fantastical notion that defendants scraped the web to find the business names, locations, *etc.* of home improvement contractors, but chose not to copy their telephone numbers, instead randomly generating telephone numbers and then attempting to link those numbers to the other data points obtained from the third-party websites. Given that intact telephone numbers were included on the same webpages from which defendants scraped the rest of the data, plaintiffs' "reverse append" theory is implausible.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 19

written, has not kept up with technology and does not effectively restrict all nuisance calls is a matter to be taken up with Congress, not the courts. *Id.* at 1172-73. Plaintiffs have failed to adequately allege a claim under 47 U.S.C. § 227(a)(1)(A).

### 4. Commercial Electronic Message Act (Fourth Cause of Action)

Washington's Commercial Electronic Message Act ("CEMA") was enacted in 1998 to target unwanted e-mail messages (a/k/a "spam"). It was amended in 2003 to address unsolicited text messages, precluding "the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager services." RCW 19.190.060(1). *Wright v. Lyft, Inc.*, 189 Wn.2d 718, 724-25 (2017). Defendants seek dismissal of the CEMA claim because (a) the statute does not provide a private right of recovery for damages, (b) no plaintiff has adequately alleged an actionable violation of CEMA, and (c) the messages at issue are not "commercial electronic text messages."

### a. Private Right of Recovery for Damages

As more fully discussed in *Wright* and *Gragg v. Orange Cab Co., Inc.*, 145 F. Supp.3d 1046, 1050-52 (W.D. Wash. 2015), a plaintiff may bring a claim for injunctive relief under CEMA, but he or she may not recover damages under that statute. Proof of a CEMA violation establishes the first three elements of a Washington Consumer Protection Act ("CPA") violation, however, and replaces the injury and causation elements with an automatic damage award of $500 or actual damages, whichever is greater. *Wright*, 189 Wn.2d at 153-54; *Gragg*, 145 F. Supp.3d at 1052-54.

Plaintiffs recognize that their claim for monetary damages related to a violation of CEMA must be pursued under the CPA, but insist that their CEMA claim should not be dismissed. Dkt. # 134 at 23-24. There is no logic to this argument. A violation of CEMA establishes all of the elements of a CPA claim, but monetary relief cannot be obtained under CEMA. Plaintiffs' only cause of action related to the CEMA allegations lies under the CPA. It is unclear why plaintiffs dropped their CPA claim when drafting their Second Amended Complaint, *see* Dkt. # 96-2, but they may not recover damages directly under CEMA.

### b. Adequacy of Allegations

Defendants argue that plaintiffs have failed to allege that they are still receiving text messages from defendants, making injunctive relief unavailable, and that the allegations of the Second Amended Complaint are too vague to raise a plausible inference that any calls were made within the applicable limitations period, precluding an award of damages. Although most of the 993 plaintiffs are not asserting a claim for CEMA violations (*see* Dkt. # 108-1, ninth column), those that are allege only that they received a certain number of calls within the four year period prior to filing their original complaint and that the calls violate CEMA, *see* Dkt. # 108 at ¶¶ 393 (David Fluckinger, 1,159 texts in the four years preceding 4/22/2020) and 652 (Douglas Love, 12 texts in the four years preceding 4/22/2020). The allegations do not give rise to a plausible inference that the CEMA violations are on-going or that injunctive relief might be appropriate.

With regards to a damages claim, such a claim can be pursued only under the CPA, which has a four-year statute of limitations. RCW 19.86.120. If plaintiffs amend their complaint to assert a CPA claim based on the alleged CEMA violations, the remaining allegations easily allow plaintiffs to prove a set of facts that would establish the timeliness of the claim. *Supermail Cargo, Inc. v. U.S.*, 68 F.3d 1204, 1206 (9th Cir. 1995). Because "[a] claim may be dismissed under Rule 12(b)(6) on the ground that it is barred by the applicable statute of limitations only when the running of the statute is apparent on the face of the complaint," a CPA claim based on the alleged CEMA violations could proceed. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (internal quotation marks and citation omitted).

### c. "Commercial Electronic Text Messages"

As defined in CEMA, a "commercial" message is one "sent to promote real property, goods or services for sale or lease." RCW 19.190.010(5). Defendants sent the text messages at issue in an effort to sell their matchmaking services: if the recipient paid a fee, defendants would give them leads to find customers. The messages were not part of an existing relationship or a step in facilitating an on-going transaction. Consideration of the messages "with a measure of common sense" shows that their only purpose was to offer and encourage the purchase/use of defendants' services. *Chesbro v. Best Buy Stores, L.P.*, 697 F.3d 1230, 1234 (9th Cir. 2012); *Gragg v. Orange Cab Co., Inc*., No. C12-0576RSL, 2013 WL 195466, at *4 (W.D. Wash. Jan. 17, 2013).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

### 5. Individual Defendant Liability

Defendants argue that the Court lacks personal jurisdiction over defendants Marrelli and Widjaja and that plaintiffs have failed to adequately allege corporate officer liability under the TCPA and/or CEMA.

### a. Personal Jurisdiction

Plaintiffs' only response to the personal jurisdiction argument is that Marrelli and Widjaja waived any challenge to the Court's jurisdiction by stipulating to a consolidation and attempting to move this litigation to an MDL panel. There has been no waiver. Marrelli and Widjaja challenged the Court's jurisdiction over them in response to the original complaint, Dkt. # 15 at 10-12, and the subsequent stipulations neither waived the jurisdictional objection nor contained any indication that these defendants voluntarily submitted to jurisdiction in the Western District of Washington.

Recognizing that they might have a problem proving waiver, plaintiffs request in the alternative that the Court sever the claims against Marelli and Widjaja and transfer them to the Northern District of California where these individuals may be found. Defendants do not oppose this request. The Court therefore severs the claims against Marelli and Widjaja under Fed. R. Civ. P. 21 and transfers them to the Northern District of California under 28 U.S.C. § 1404(a) (authorizing transfer "in the interest of justice" to a district where the action "might have been brought").

1

2

### b. Corporate Officer Liability

3

The parties agree that corporate officer liability generally hinges on whether the

4

officer had direct, personal participation in or personally authorized the unlawful conduct

5

at issue. *See, e.g.*, *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021

6

(9th Cir. 1985) ("A corporate officer or director is, in general, personally liable for all torts

7

which he authorizes or directs or in which he participates, notwithstanding that he acted as

8

an agent of the corporation and not on his own behalf.") (internal quotation marks and

9

citation omitted). The question, then, is whether plaintiffs' allegations regarding defendant

10

Ehrlichman[7] give rise to a plausible inference of personal involvement. Plaintiffs allege

11

that Ehrlichman is listed as GoSmith's Governor in the corporate records of Washington

12

and as the CEO of GoSmith and/or Porch.com in California's corporate records. They

13

further allege that, in those roles, Ehrlichman was responsible for promulgating policies

14

and procedures that complied with the TCPA and training employees on how to comply

15

with the TCPA. These allegations are little more than an assertion that a corporate officer

16

is responsible for the failures or acts of the corporation based on nothing more than his

17

position, a proposition that has been repeatedly rejected by the courts. Plaintiffs also allege

18

that Ehrlichman "knowingly participated [in], authorized, built, and directed" the unlawful

19

telemarketing scheme at issue. The allegation is not that Ehrlichman placed the violative

20

calls, but that he built the system that violated the TCPA and directed corporate employees

21

22

23

24

25

26

---

[7] The Court lacks personal jurisdiction over Marelli and Widjaja and will not evaluate the adequacy of the allegations with regards to those individuals.

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 24

to send the messages. These allegations may or may not be true, but they give rise to a reasonable inference that Ehrlichman "initiated" the calls and can be held individually liable for violations of 47 C.F.R. § 64.1200(c) and (d).

With regards to liability for a CEMA violation, the parties agree that plaintiff must raise a plausible inference that Ehrlichman "assist[ed] the transmission" of text messages that violated the act. CEMA defines "assist the transmission" to mean acts taken to provide "substantial assistance or support" enabling another to "formulate, compose, send, originate, initiate, or transmit a commercial electronic text message when the actor "knows or consciously avoids knowing" that the message is unlawful. RCW 19.190.010(1). To the extent Ehrlichman built, authorized, directed, and participated in GoSmith's text message campaign, his conduct would qualify as assisting in the transmission for purposes of CEMA.

### 6. Porch.com Liability

Plaintiffs allege that Porch.com acquired GoSmith in January 2017 and subsequently integrated GoSmith's system for selling leads with its own lead generation apparatus. *See* Dkt. # 108 at ¶¶ 78 and 81. Plaintiffs identify a number of theories under which a parent corporation can be held liable for the acts of a subsidiary, including vicarious liability, agency, alter ego/veil piercing, and ratification. While each theory has specific elements, plaintiffs' allegations give rise to a reasonable inference that Porch.com has subsumed GoSmith's platform and directs its activities in order to serve the needs of its own clients. Plaintiffs allege that Porch.com provided telecommunications resources to

1    enable GoSmith to send out the telemarketing text messages, brought GoSmith's

2    executives into its own executive suite, supplied almost all of the leads GoSmith offered

3    after January 2017, and has perpetuated GoSmith's business practices, despite complaints,

4    for its own purposes. When GoSmith was shut down in January 2020, it migrated all of its

5    customer information (*i.e.*, its assets) to Porch.com. The unity of conduct prior to January

6    2020 plus the transfer of GoSmith's assets to Porch.com in January 2020 raise a plausible

7    inference that the latter can be held liable for at least some portion of the former's conduct.

8    **B. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)**

9        Defendants challenge plaintiffs' standing to pursue certain claims asserted in this

10   litigation. "[S]tanding is an essential and unchanging part of the case-or-controversy

11   requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In order

12   to establish a federal court's jurisdiction over a case or controversy, plaintiffs must show

13   that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged

14   conduct ..., and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v.*

15   *Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560-61); *Perry v. Newsom*,

16   18 F.4th 622, 630 (9th Cir. 2021), *cert. denied sub nom*. *Hollingsworth v. Perry*, 143 S. Ct.

17   301 (2022)). A defendant challenging the Court's jurisdiction under Rule 12(b)(1) may do

18   so either on the facts as alleged in the pleadings or by presenting extrinsic evidence of the

19   true facts for the Court's consideration. *See Safe Air for Everyone v. Meyer*, 373 F.3d

20   1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1)  jurisdictional attack may be facial or

21   factual.").

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 26

Defendants argue that plaintiffs lack Article III standing to pursue their company-specific do-not-call claims because they did not request that GoSmith stop calling them. For the reasons discussed in section 2 of this Order, a stop request is not a prerequisite to a claim under 47 C.F.R. § 64.1200(d)(4), and the vast majority of plaintiffs who have asserted a violation of 47 C.F.R. § 64.1200(d)(3) have adequately stated that they made a stop request. For the few plaintiffs who failed to allege the necessary facts to state a claim under subsection (d)(3), leave to amend will be granted.

## C. Leave to Amend

Courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). There is a "strong policy in favor of allowing amendment" (*Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994)), and "[c]ourts may decline to grant leave to amend only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment, *etc.*" (*Sonoma County Ass'n of Retired Employees v. Sonoma County*, 708 F.3d 1109, 1117 (9th Cir. 2013) (internal quotation marks and alterations omitted)). The underlying purpose of Rule 15 is "to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).

The Court finds that allowing plaintiffs to amend their allegations regarding the § 64.1200(d)(3) claim asserted by Keith Johnson, Robert Jones, Stephen Richardson, Reese Robinson, Mark Anthony Rodriguez, Artem Rudyy, and Brandon Weichers is

appropriate. Plaintiffs will also be permitted to amend their Fourth Cause of Action to assert a claim for damages under the CPA that is based on the alleged CEMA violations.

For all of the foregoing reasons, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiffs' motion to amend is also GRANTED in part and DENIED in party. Because the thirty-seven plaintiffs identified at Dkt. # 131-1 have asserted only an automated telephone dialing system claim and that claim has been dismissed without leave to amend, the Clerk of Court is directed to terminate their participation in this case. The Clerk is further directed to transfer the claims asserted against defendants Marelli and Widjaja to the Northern District of California under 28 U.S.C. § 1404(a).

If plaintiffs intend to file a Third Amended Complaint, they shall do so within 21 days of the date of this Order.

Dated this 13th day of November, 2024.

*Robt S Lasnik*

Robert S. Lasnik
United States District Judge

ORDER GRANTING IN PART DEFENDANTS' MOTION
TO DISMISS - 28